IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

FELDMAN'S MEDICAL CENTER
PHARMACY, INC., *et al.*,

    Plaintiffs,

        v.

CAREFIRST, INC., *et al.*,

    Defendants.

            CIVIL NO.: WDQ-12-3189

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Feldman's Medical Center Pharmacy, Inc. ("Feldman's") and
Pharmacy Management Associates, LLC ("PMA") (collectively, the
"Plaintiffs") sued CareFirst, Inc. ("CareFirst") and others
(collectively, the "Defendants")[1] in the Circuit Court for
Baltimore City, Maryland, alleging intentional interference with
economic relations and other state claims. Independence and QCC
removed the lawsuit to this Court, arguing that the Plaintiffs'
claims were completely preempted by the Employee Retirement
Income Security Act of 1974 ("ERISA")[2]. *Feldman's Med. Ctr.
Pharmacy, Inc. v. CareFirst, Inc.*, No. WDQ-12-0613, 902 F. Supp.
2d 771, 779 (D. Md. 2012). This Court disagreed and, on October

---

[1] The other named Defendants are Independence Blue Cross
("Independence"), QCC Insurance Company ("QCC"), and the Blue
Cross Blue Shield Association (the "Association"). The
Plaintiffs also sued John Does 1-10.

[2] 29 U.S.C. §§ 1001, *et seq.*

5, 2012, remanded the action. *Id.* at 783. On October 31, 2012,
the Association filed a second notice of removal. ECF No. 1.
No hearing is necessary. *See* Local Rule 105.6 (D. Md. 2011).
For the following reasons, the Plaintiffs' motion to remand will
be granted, their motion for sanctions will be denied, and the
action--and all other pending motions--will be remanded to the
Circuit Court for Baltimore City.

I. Background[3]

A. Factual Background

The Defendants are health insurers. *See* Am. Compl. ¶¶ 3-6,
76. The Association is a national federation that licenses 39
locally operated Blue Cross and Blue Shield companies, including
CareFirst, a Maryland corporation, and Independence, a
Pennsylvania corporation. *Id.* ¶¶ 4-6, 76.[4] QCC, a Pennsylvania
corporation, is a wholly-owned subsidiary of Independence. *Id.*
¶ 6.

Feldman's is a Maryland corporation. Am. Compl. ¶ 1. In
the 1970s, it began operating a retail pharmacy that dispensed

---

[3] In considering whether a defendant has been fraudulently
joined, the Court must resolve "all issues of . . . fact in the
plaintiff's favor." *Hartley v. CSX Transp., Inc.*, 187 F.3d 422,
424 (4th Cir. 1999).

[4] The Association's 39 licensees provide health insurance to more
than 100 million Americans. Am. Compl. ¶ 117.

specialty drugs.  *Id.* ¶¶ 1, 35, 69.[5]  Feldman's regularly submitted reimbursement claims to CareFirst for the drugs that it dispensed to patients insured by CareFirst and Independence. *Id.* ¶ 69.[6]

In October 2007, PMA, a Maryland limited liability company, purchased Feldman's.  Am. Compl. ¶¶ 2, 60.  The pharmacy became "increasingly focused" on dispensing specialty drugs to treat hemophilia,[7] such as synthetic factors that aid in blood clotting.  *See id.* ¶¶ 14, 36, 52.  Synthetic factors, which are injected into the bloodstream, cost "tens of thousands of dollars a month" because of the "time it takes to manufacture the drugs, the small number of hemophilia patients in the United States, and the frequency of the required injection treatments." *Id.* ¶ 14.[8]

---

[5] "'Specialty' drugs are prescription medications for complex conditions that require special handling, administration, or monitoring."  *Id.* ¶ 32.

[6] The Association's licensees, including CareFirst and Independence, participated in a national program that allowed patients insured by one licensee to obtain healthcare services while traveling or living in another state served by a different licensee.  Am. Compl. ¶¶ 72, 103.  Thus, CareFirst administered claims for Independence members who had received healthcare services in CareFirst's coverage area.  *See id.* ¶¶ 104-05.

[7] Hemophilia--a genetic disorder that impairs the body's ability to control blood clotting--is caused by a deficiency of clotting proteins called "factors."  *Id.* ¶¶ 10, 12.

[8] Most pharmacies do not stock synthetic factors because of their expense and "limited shelf life," and "the relative rarity of

Before dispensing factor drugs to CareFirst patients, Feldman's "checked the patients' benefits" and "received [an oral] precertification for the prescription from CareFirst." Am. Compl. ¶ 315. Feldman's began "submitting [reimbursement] claims for relatively large numbers of hemophilia patients" as its "business grew substantially in a short . . . time." *Id.* ¶¶ 71, 128.

Sometime after PMA acquired Feldman's, CareFirst stopped paying the pharmacy's reimbursement claims.[9] On October 26, 2007, Calvin Sneed, an antifraud consultant for the Association, asked the Association's antifraud managers to contact the Association's licensee in Louisiana with any information about "exposure to" FCS Pharmacy ("FCS"), which is affiliated with PMA. Am. Compl. ¶¶ 147-48. After Sneed's October 2007 request, the Association and the special investigation units of its licensees formed a "strike force" to coordinate their investigations of FCS and other pharmacies dispensing synthetic factors. *Id.* ¶ 150. On December 5, 2007, CareFirst investigator Jaime Hanson emailed another investigator about CareFirst's "serious exposure" to FCS that "warrant[ed]

---

hemophilia." *Id.* ¶ 27.

[9] The Plaintiffs assert that CareFirst "continued . . . to deny payment" after February 20, 2008, and "put a 'hold'" on claims "[s]hortly after" June 26, 2008. *See, e.g.*, Am. Compl. ¶¶ 170, 177, 196-97, 240.

investigation." *Id.* ¶ 151 (internal quotation marks omitted).

On February 6, 2008, Sneed coordinated a conference call for medical directors of the Association's licensees. Am. Compl. ¶ 154. Before the conference call, Sneed distributed a memorandum about "whether it was possible to establish coverage and/or payment restrictions on [f]actor drugs due to the high cost of such drugs." *Id.* On February 12, 2008, Sneed asked all Association licensees for "data relating to the amount of payments made to pharmacies dispensing [synthetic factor]." *Id.* ¶ 157. The request "specifically excluded patients who received factor[s] from large, national[,] or institutional providers." *Id.*

CareFirst "regularly" told other Association licensees and law enforcement officials that Feldman's was committing fraud. Am. Compl. ¶ 186. The Food and Drug Administration (the "FDA") investigated allegations by the Association and its licensees that Feldman's was "dispensing more [f]actor medicine than a patient needed" and diverting it to a gray market[10] where Feldman's sold the medicine for cash. *Id.* ¶¶ 190-94.

On February 20, 2008, the FDA closed its investigation after finding "no evidence of the suspected diversion." Am.

---

[10] A gray market is "[a] market in which the seller uses legal but sometimes unethical methods to avoid a manufacturer's distribution chain and thereby sell goods . . . at prices lower than those envisioned by the manufacturer." *Black's Law Dictionary* (9th ed. 2009).

Compl. ¶ 196. CareFirst continued to assert that Feldman's was diverting synthetic factors to the gray market, and denied payments to Feldman's. *Id.* ¶ 197.

On March 13, 2008, CareFirst's pharmacy director, Winston Wong, told CareFirst's antifraud investigators that the company "had not found any real problems with Feldman's." Am. Compl. ¶ 160.

In April 2008, the National Health Care Antifraud Association hosted its annual pharmacy conference, where an agent with the Federal Bureau of Investigation ("FBI") asked anyone "dealing with hemophiliacs to contact him." Am. Compl. ¶ 162. Hanson, CareFirst's investigator, attended the conference and contacted the FBI agent. *Id.* "[T]he FBI was not impressed with [Hanson's] information," and "never pursued a formal investigation of Feldman's." *Id.* ¶ 163.

On June 2, 2008, Independence asked Feldman's for "information and documents," and thereafter stopped paying Feldman's claims. Am. Compl. ¶ 108.

On June 19, 2008, CareFirst "officially" opened an investigation of Feldman's. Am. Compl. ¶ 164. CareFirst, Independence, and the Association interviewed "numerous" Feldman's employees and patients, and advised patients to "consider a switch" to pharmacy services operated by CareFirst's

pharmacy benefit managers. *Id.* ¶¶ 261, 263.[11] Many patients left Feldman's. *Id.* ¶ 264.

On June 26, 2008, CareFirst investigators conducted an on-site audit of Feldman's. Am. Compl. ¶ 169. Although the audit revealed no wrongdoing, CareFirst put a "hold" on all claims for reimbursement. *Id.* ¶ 170. CareFirst did not inform Feldman's of the hold, but advised other Association licensees not to pay Feldman's. *Id.* ¶¶ 177, 319. On "numerous occasions," CareFirst told Independence that it was denying claims because Feldman's had "improper licensure." *Id.* ¶ 178.

On August 21, 2008, CareFirst refused to renew its contract with Feldman's because it lacked a Residential Service Agency license (an "RSA license"). Am. Compl. ¶ 233. An RSA license is required under Maryland law to provide health care services in a patient's home. *See id.* ¶ 219. On August 22, 2008, a PMA employee emailed CareFirst to explain that Feldman's did not provide services in patients' homes and, thus, did not require an RSA license. *Id.* ¶ 234. CareFirst continued to give Feldman's precertification for factor medicine claims, but denied reimbursement claims. *See id.* ¶¶ 240, 317-18.

---

[11] Health insurance companies contract with pharmacy benefit managers ("PBMs") to administer and process prescription drug claims, negotiate prices with drug manufacturers, and contract with pharmacies for dispensing drugs. Am. Compl. ¶¶ 41, 44. Many PBMs compete with independent pharmacies by operating their own retail and mail order pharmacies, which offer lower prices than independent specialty pharmacies. *Id.* ¶¶ 30, 45.

On October 6, 2008, Hanson sent an email to CareFirst colleagues about Sneed "talking to FDA and FBI agents in Texas [about] a possible diversion case." Am. Compl. ¶ 198. On October 29, 2008, representatives of Sneed, CareFirst, and Independence attended a strike force meeting in Pennsylvania. *Id.* ¶ 182.[12]

On December 11, 2008, Feldman's obtained an RSA license because of "CareFirst's insistence," but CareFirst continued to deny reimbursement claims. Am. Compl. ¶¶ 236-37, 240.

On February 12, 2009, Hanson told Independence investigators that Feldman's lacked the proper license for dispensing factor drugs. Am. Compl. ¶ 298. On February 13, 2009, Independence told Feldman's that it had been rejecting claims because of CareFirst's determination that Feldman's "did not have the appropriate licensing." *Id.* ¶ 108. Independence told other Association licensees that Feldman's lacked necessary licenses. *Id.* ¶ 227.

On March 25, 2009, Hanson wrote a memo to Stacy Breidenstein, CareFirst's associate director of network management, requesting that CareFirst investigators "be included in the decision whether to extend a new contract to Feldman's." Am.

---

[12] The Plaintiffs assert, "[o]n information and belief," that Feldman's was "one of the main topics of discussion," and the Defendants "developed the 'theories' that would be used to deny" reimbursement claims submitted by Feldman's. Am. Compl. ¶¶ 183-84.

Compl. ¶ 214. Hanson cited "'possible diversion' as the reason for the scrutiny." *Id.*

On April 30, 2009, Hanson told Sneed in an email that "CareFirst had decided not to offer Feldman's a new contract and . . . was just looking for the strongest *ex post* justification for its denial." Am. Compl. ¶ 215.

After PMA acquired Feldman's, accounts receivable "ballooned" from $430,000 to more than $3 million. Am. Compl. ¶ 252. In March 2009, Feldman's "began to wind down its business." Am. Compl. ¶ 72. On April 16, 2009, Hanson told other Association licensees during a conference call that Feldman's was "a problem company." Am. Compl. ¶¶ 304-05.

By July 2009, accounts receivable at Feldman's had grown to $3.95 million, and Feldman's defaulted on its bank loans. Am. Compl. ¶ 252. On August 7, 2009, Hanson told an investigator with the Association's Louisiana licensee that Feldman's had filed for bankruptcy. Am. Compl. ¶¶ 187, 188, 302. It had not. Am. Compl. ¶ 302.

On December 17, 2009, PMA sold Feldman's assets "at fire sale prices." Am. Compl. ¶¶ 55, 145, 253.

B. *Feldman's I*

On June 1, 2009, Feldman's sued CareFirst in the Circuit

Court for Baltimore County[13] for $1,588,127.77 plus interest for breach of contract, unjust enrichment, and bad faith. *Feldman's Med. Ctr. Pharmacy, Inc. v. CareFirst, Inc.*, No. WDQ-10-0254, 723 F. Supp. 2d 814, 816 (D. Md. 2010). Feldman's alleged that CareFirst had violated a 1997 provider agreement[14] because Feldman's was a participating provider, the factors it dispensed to CareFirst members were "Covered Services," and CareFirst had refused to "correctly and timely pay" more than $1.5 million in "legitimate claims" for reimbursement. *Id.* (internal quotation marks omitted). Feldman's alleged alternatively that it was entitled to reimbursement because CareFirst members had assigned their benefits to Feldman's. *Id.*[15]

On February 1, 2010, CareFirst removed the lawsuit to this

---

[13] *Feldman's Med. Ctr. Pharmacy, Inc. v. CareFirst, Inc.*, No. 03-C-09-006257 (Cir. Ct. for Balt. Cnty. filed June 1, 2009).

[14] Under the agreement, Feldman's became a participating provider in CareFirst's network, and CareFirst agreed to reimburse Feldman's for "Covered Services rendered to [CareFirst] Members." *See* 723 F. Supp. 2d at 816 (internal quotation marks omitted). A "Covered Service" was a "medically necessary service or supply provided to a Member for which the Member [was] entitled to receive a benefit under the [CareFirst] Program in which he/she [was] enrolled." *Id.* (internal quotation marks omitted). A "Member" was "any eligible person covered under a [CareFirst] Program." *Id.* (internal quotation marks omitted).

[15] The assignments provided that "[u]nder no circumstances" was an insured to retain any payment from his insurer for Feldman's products, and allowed Feldman's "to bill for services and receive payment directly from [a patient's] private health Insurance." *Id.* at 817 (internal quotation marks omitted).

Court. *Id.* at 817. CareFirst argued that, to the extent that Feldman's had sued as the assignee of CareFirst members, its breach of contract and unjust enrichment claims were completely preempted by ERISA, thus "providing federal question jurisdiction." *Id.*

On June 29, 2010, the Court found that any "assignment-based claims [were] completely preempted by ERISA," and denied Feldman's motion to remand. 723 F. Supp. 2d at 815, 821. Specifically, the Court held that a healthcare provider "may acquire derivative standing under ERISA by obtaining a written assignment from a participant or beneficiary of his right to payment of medical benefits." *Id.* at 819. The Court further found that the "only theory of recovery under the assignments"--the wrongful denial of benefits--"directly implicate[d] ERISA," and would require the Court to interpret ERISA plans. *Id.* at 820-21.

After the motion to remand was denied, the parties consented to proceed before U.S. Magistrate Judge Susan K. Gauvey. *Feldman's Med. Ctr. Pharmacy, Inc. v. CareFirst, Inc.*, No. SKG-10-0254, 823 F. Supp. 2d 307, 309-10 (D. Md. 2011). On March 4, 2011, Feldman's moved for summary judgment, seeking: (1) judgment on Counts One through Three for non-payment of invoices, in the amount of $109,989.32; (2) interest on the unpaid contributions, in the amount of $886,483.93; and (3)

11

attorneys' fees and costs. *Id.* at 310. Feldman's asserted

entitlement to prejudgment interest under Md. Code Ann., Insur.

§ 15-1005 (the "Maryland Prompt Pay Statute") or, alternatively,

under ERISA § 502. *Id.* CareFirst opposed Feldman's motion for

summary judgment and moved for partial summary judgment on

Feldman's claims for reimbursement and prejudgment interest

under the Maryland Prompt Pay Statute. *Id.*

Judge Gauvey resolved the summary judgment motions in a

November 9, 2011 memorandum opinion and order. Because

CareFirst had already paid $1,547,054.87 in satisfaction of

Feldman's claims for reimbursement, as well as $23,017 in

interest,[16] the opinion was limited to addressing Feldman's claim

for prejudgment interest. *Id.* at 310. Judge Gauvey concluded

that prejudgment interest would be awarded under ERISA § 502, at

the federal postjudgment rate set forth in 28 U.S.C. § 1961.

*Id.* at 311. Judge Gauvey did not address Feldman's entitlement

to attorneys' fees. *See id.* at 310 n.2.

On December 12, 2011, Feldman's moved for more than $1

---

[16] On August 20, 2010, CareFirst informed the Court that it had
received an "opinion" from the Maryland Board of Pharmacy about
the RSA licensing issue, and--based on that opinion--was "ready
to pay the claims at issue." No. WDQ-10-0254, ECF No. 74.
Between September 17, 2010 and December 24, 2010, CareFirst paid
Feldman's $1,547,054.87. *Id.*, ECF No. 145.

12

million in attorneys' fees under 29 U.S.C. § 1132(g)(1).[17]  On

September 28, 2012, Judge Gauvey denied the request in a 61-page

order.  *Feldman's Med. Ctr. Pharmacy, Inc. v. CareFirst, Inc.*,

No. SKG-10-0254, 898 F. Supp. 2d 883 (D. Md. 2012) [hereinafter,

the "September 28 order"].  The September 28 order began by

assessing whether Feldman's had achieved "some degree of success

on the merits," as required by *Hardt v. Reliance Std. Life Ins.

Co.*, 560 U.S. 242 (2010).  *Id.* at 896.  Feldman's argued that it

had met the *Hardt* standard, because "CareFirst paid 100% of the

face value of the outstanding claims at issue as a result of the

filing of this action."  *Id.* (internal quotation marks omitted).

CareFirst contended that the November 2011 summary judgment

opinion did not reach the merits of the dispute, and was not

decided in favor of Feldman's.  *Id.*  CareFirst further objected

to Feldman's reliance on the "catalyst theory"--which allows for

attorneys' fees when a party obtains relief, through settlement

or otherwise--in arguing that it achieved some success on the

merits.  *Id.*

Assuming that the catalyst theory did apply, and that

Feldman's could meet the threshold *Hardt* standard, Judge Gauvey

concluded that fees were inappropriate under *Quesinberry v. Life*

---

[17] The statute provides that, in any ERISA action by a
participant, beneficiary, or fiduciary, the court "in its
discretion" may allow a reasonable attorney's fee and costs of
action to either party.  § 1132(g)(1).

13

*Ins. Co. of N. Am.*, 987 F.2d 1017 (4th Cir. 1993) (en banc).
*See* 898 F. Supp. 2d at 899, 907.[18]  In assessing the first
*Quesinberry* factor (degree of the opposing party's culpability
or bad faith), after conducting a "careful review" of the
record, Judge Gauvey stated there was "no evidence" of bad
faith, venality, or culpability in CareFirst's business dealings
with Feldman's. *Id.* at 908.  Specifically, "[t]here is no
evidence presented that CareFirst intentionally or even wantonly
withheld payment or disregarded a clear statement that
[Feldman's] did not provide in-home services related to infusion
drugs or any argument that state law did not require a RSA
licensure." *Id.* at 909.  Nor, she found, was there evidence
that CareFirst acted in "bad faith" in delaying payment for
claims after Feldman's acquired an RSA license. *Id.*

After considering the remaining four *Quesinberry* factors,
others of which "weigh[ed] on the side of CareFirst," Judge
Gauvey concluded that the case was not so "unusual" as to compel
an award under ERISA. *See* 898 F. Supp. 2d at 910-11.

---

[18] Whether an award of attorneys' fees is appropriate is guided
by the court's examination of five factors: (1) the degree of
opposing parties' culpability or bad faith; (2) the ability of
opposing parties to satisfy an award of attorneys' fees; (3)
whether an award of attorneys' fees against the opposing parties
would deter other persons acting under similar circumstances;
(4) whether the parties requesting attorneys' fees sought to
benefit all participants and beneficiaries of an ERISA plan or
to resolve a significant legal question regarding ERISA itself;
and (5) the relative merits of the parties' positions.  987 F.2d
at 1029.

14

C. Procedural History of This Case

1. Phase One: The October 2012 Remand

On December 29, 2011--after the motions for summary
judgment were resolved in *Feldman's I*, but before Feldman's
motion for attorneys' fees and costs in that case had been fully
briefed--the Plaintiffs filed suit against the Defendants in the
Circuit Court for Baltimore City. *Feldman's Med. Ctr. Pharmacy,*
*Inc. v. Carefirst, Inc.*, No. 24-C-11-008977 (Cir. Ct. for Balt.
City, filed Dec. 29, 2011). On January 18, 2012, the Plaintiffs
filed an amended complaint, alleging that the Defendants had
"participated in a scheme" to

> (a) drive Feldman's out of business, (b) direct
> [Feldman's] hemophilia patients . . . away from
> insurance plans offered by [the Association's]
> licensees, (c) purge hemophiliacs from the rosters of
> their insureds and push Feldman's hemophilia patients
> to government programs such as Medicare and Medicaid,
> and/or (d) steer Feldman's hemophilia patients to
> large pharmacies and pharmacy benefit managers for
> whom [the] Defendants receive a financial benefit or
> in whom [the] Defendants have a financial interest.

Am. Compl. 2.[19] The Plaintiffs sought $8 million in damages,

---

[19] The Plaintiffs alleged six causes of action under state law:
  (1) intentional interference with economic relations, for
     "provid[ing] false information to [the] Plaintiffs'
     patients" and "investigat[ing], harass[ing], delay[ing]
     payment to, boycott[ing], and destroy[ing] [the]
     Plaintiffs' business," Am. Compl. ¶¶ 275-88;
  (2) defamation--against CareFirst and the Association only, *see*
     *id.* 61--for telling government agents and patients that
     Feldman's was involved in fraud, telling Independence that
     Feldman's lacked a necessary license, and telling the
     Association's other licensees that Feldman's was bankrupt

plus interest and costs.[20]

On February 24, 2012, Independence and QCC removed the
lawsuit to this Court, arguing that "all or part of the
purported state law claims" were preempted by ERISA. *Feldman's*
*Med. Ctr. Pharmacy, Inc. v. CareFirst, Inc.*, No. WDQ-12-0613,

---

and a "problem company," *id.* ¶¶ 289-313;
(3) fraud and fraudulent misrepresentation--against CareFirst
only, *see id.* 65--for CareFirst's precertification of
claims it "had no intention of ever paying," *id.* ¶¶ 314-28;
(4) unfair competition--against CareFirst and Independence
only, *see id.* 67--for "refus[ing] to pay Feldman's the
millions of dollars they owed . . . even after CareFirst
encouraged Feldman's to continue to dispense . . .
medicine," "insist[ing] that Feldman's was missing a
crucial RSA license . . . even though . . . CareFirst knew
that Feldman's did not need the RSA license" and
"Independence made no attempt to independently verify"
licensing requirements, "encourag[ing] . . . Feldman's
patients to abandon Feldman's," and making "baseless and
defamatory statements" about Feldman's, *id.* ¶¶ 329-38;
(5) conspiracy, for "act[ing] with unity of purpose" to "harass
Feldman's and drive it out of the pharmacy business" by
"denying and delaying payment to Feldman's," encouraging
patients to switch to other pharmacies, and "perpetuating
continual baseless investigations of Feldman's," *id.* ¶¶
339-46; and
(6) violation of the Maryland Antitrust Act, Md. Code Ann.,
Com. Law § 11-204(a)(1), for "conspir[ing] to harass,
intimidate, and drive Feldman's out of business by . . .
putting a hold on Feldman's claims," "'investigating'
Feldman's without any basis for suspecting wrongdoing,"
"spreading defamatory and malicious rumors of Feldman's
purported criminal behavior," and "'recommending' that
Feldman's customers take their business to pharmacy
benefits managers and chain pharmacies in which . . .
CareFirst and/or Independence had a financial interest,"
*id.* ¶¶ 347-54.

[20] *See, e.g.*, Am. Compl. 60. In Count VI (violation of the
Maryland Antitrust Act), the Plaintiffs also sought treble
damages and attorney fees. *See id.* 73.

16

902 F. Supp. 2d 771, 779 (D. Md. 2012).  On October 5, 2012, the
Court granted the Plaintiffs' motion to remand.  *Id.* at 783.
The Court held, *inter alia*, that because the Plaintiffs were not
suing as assignees or participants of an ERISA plan, or to
enforce a remedy under ERISA § 502, ERISA complete preemption
did not apply.  *Id.* at 783.

    2. Phase Two: A Second Removal

    On October 31, 2012, the Association removed the lawsuit--
again--to this Court.  ECF No. 1, Notice of Removal.[21]  As a
basis for the second removal, the Association argued that Judge
Gauvey's September 28 order in *Feldman's I* "collaterally
estop[s]" the Plaintiffs from "establishing any of their claims"
against CareFirst, requiring CareFirst's dismissal under the
doctrine of fraudulent joinder.  *See id.* ¶¶ 20, 28.  Because
CareFirst is the only nondiverse defendant, the Association
contended that diversity jurisdiction now exists under 28 U.S.C.
§ 1332.  *See id.* ¶¶ 6, 19, 20.

    On November 7, 2012, the Defendants moved to dismiss.  ECF
Nos. 7, 12, 13.  On January 4, 2013, the Plaintiffs timely
opposed the motions to dismiss.  ECF No. 37.  Also on January 4,
the Plaintiffs moved to remand and for attorneys' fees and
costs.  ECF No. 38.  On February 1, 2013, the Plaintiffs moved

---

[21] The other Defendants joined in the removal.  ECF No. 1 ¶ 14;
*see* ECF Nos. 3, 4.

for sanctions. ECF No. 42. That day, the Defendants jointly replied in support of the motions to dismiss, ECF No. 44, and opposed the motion to remand and for attorneys' fees, ECF No. 45. On February 15, 2013, the Plaintiffs replied in support of the motion to remand. ECF No. 46.[22]

II. Analysis

A. The Motion to Remand

The Plaintiffs argue that the Court lacks subject matter jurisdiction--and must remand the case--because the parties are not diverse. *See generally* ECF No. 38 ¶¶ 13-14.[23] The Defendants contend that the Court has diversity jurisdiction because CareFirst--the only nondiverse defendant--was fraudulently joined. *See, e.g.*, ECF No. 45 at 1.

1. Legal Standards

a. Removal Under § 1441(a)

Under 28 U.S.C. § 1441(a), "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant . . . to the district court of the United States for the district and division embracing the place where such action is pending."

---

[22] The motions to dismiss and remand were timely briefed. *See* ECF No. 36, Joint Stipulation and Order.

[23] The Plaintiffs also assert that removal was untimely. *See, e.g.*, ECF No. 38 ¶ 12; ECF No. 38-1 at 8, 19-21. Because the Court concludes that it does not have jurisdiction, it need not reach this procedural argument.

The district courts have original jurisdiction of, *inter alia*, "all civil actions where the matter in controversy exceeds . . . $75,000, exclusive of interest and costs, and is between . . . citizens of different States." § 1332(a)(1).

To remove a case, the defendant must file a notice of removal in the district court within 30 days after receiving the initial pleading, or within 30 days after the defendant receives a copy of a paper from which it is first evident that the case is removable. 28 U.S.C. § 1446(a)-(b). All defendants must join in or consent to the removal. *Id.* § 1446(b)(2)(A). The removing party has the burden of proving subject matter jurisdiction. *Md. Stadium Auth. v. Ellerbe Becket Inc.*, 407 F.3d 255, 260 (4th Cir. 2005). Because removal raises "significant federalism concerns," the removal statutes must be strictly construed, and all doubts must be resolved in favor of remanding the case to state court. *Id.* (internal quotation marks omitted).

b. Fraudulent Joinder

The fraudulent joinder doctrine is an exception to the complete diversity requirement.[24] The doctrine allows a federal court to "disregard, for jurisdictional purposes," the citizen-

---

[24] *E.D. ex rel. Darcy v. Pfizer, Inc.*, Nos. 12-2188, 12-2189, 12-2190, 12-2191, 12-2193, 12-2194, 12-2195, 12-2197, 12-2199, 12-2205, 12-2207, 12-2208, 12-2218, 12-2219, 12-2220, 12-2221, 12-2223, 12-2224, 2013 WL 3487397, at *2 (4th Cir. July 12, 2013).

ship of nondiverse defendants, assume jurisdiction over a case, dismiss those defendants, and "thereby retain jurisdiction." *Mayes v. Rapoport*, 198 F.3d 457, 461 (4th Cir. 1999). The party asserting fraudulent joinder bears the burden of "demonstrat[ing] either outright fraud in the plaintiff's pleading of jurisdictional facts or that there is *no possibility* that the plaintiff would be able to establish a cause of action against the in-state defendant in state court, . . . even after resolving all issues of law and fact in the plaintiff's favor." *Hartley v. CSX Transp., Inc.*, 187 F.3d 422, 424 (4th Cir. 1999) (emphasis in original) (internal quotation marks omitted).[25] The court must "resolve all doubts about the propriety of removal in favor of retained state court jurisdiction." *Id.* at 425 (internal quotation marks omitted).

That a complaint would not survive a defendant's motion to dismiss under Fed. R. Civ. P. 12(b)(6) does not mean that that defendant has been fraudulently joined: the standard is more favorable than the 12(b)(6) standard. *Id.* at 424. If there is any possibility of recovery, the defendant has not been fraudulently joined. *Id.* The Court may "consider the entire record," not only the complaint, to "determine the basis of joinder by any means available." *AIDS Counseling & Testing*

---

[25] A "glimmer of hope" for relief will prevent a finding of fraudulent joinder. *See Mayes*, 198 F.3d at 466.

*Ctrs. v. Grp. W Television, Inc.*, 903 F.2d 1000, 1004 (4th Cir. 1990) (internal quotation marks omitted). But, it may not act as a factfinder or "delv[e] too far into the merits in deciding a jurisdictional question." *Hartley*, 187 F.3d at 425.

    2. The Motion

    The Defendants argue that the Plaintiffs are collaterally estopped from asserting their claims against CareFirst because, in denying Feldman's request for attorneys' fees in *Feldman's I*, Judge Gauvey's September 28 order "found" that CareFirst had not acted culpably or in bad faith in its business dealings with Feldman's, and CareFirst's culpability is the "predicate factual issue underlying CareFirst's alleged liability to [the] Plaintiffs" in this case. ECF No. 45 at 1, 8-14. The Defendants conclude that CareFirst was fraudulently joined as a defendant, and, accordingly, its Maryland citizenship does not defeat diversity jurisdiction. *See id.* at 1, 14, 10-11. The Plaintiffs object that the Defendants "cannot establish" the "most basic requirement of collateral estoppel--that the issues that act as a bar to this action were already litigated and determined in a prior proceeding." ECF No. 38-1 at 7.[26] The

[26] The Plaintiffs also argue that, because this Court "already determined that it did not have subject matter jurisdiction over this case," the "law of the case" doctrine bars the Defendants from "raising a different legal theory upon which to now base jurisdiction." *See* ECF No. 38-1 at 10-13. Because the Defendants removed on grounds that were not considered--much

motion to remand will be granted.

As an initial matter, the Defendants cite no authority for the proposition that collateral estoppel may be asserted as a basis for fraudulent joinder. Because a court may not act as a factfinder in deciding a jurisdictional question, *Hartley*, 187 F.3d at 425, "affirmative defenses reaching the merits of a case should generally not provide the basis for a finding of fraudulent joinder." *Vincent v. First Republic Bank Inc.*, No. C 10-01212 WHA, 2010 WL 1980223, at *4 (N.D. Cal. May 17, 2010). Application of the doctrine seems particularly inapt here, given that the purportedly preclusive decision in *Feldman's I* was rendered months after the plaintiff filed suit in the present action. Indeed, of the few cases in which a defendant asserted improper joinder based on estoppel issues, the potentially preclusive decision appeared long before--not during--litigation

---

less decided--in the Court's October 5, 2012 remand opinion, the law of the case doctrine has no relevance here. *See Carter v. Monsanto Co.*, 635 F. Supp. 2d 479, 485 (S.D. W. Va. 2009) ("Where the question at issue has not already been decided in the case, explicitly or by necessary implication, the law of the case doctrine does not apply."); *see also* 28 U.S.C. § 1446(b)(3) (defendant may file a notice of removal within 30 days after receiving papers "from which it may first be ascertained that the case is one which is *or has become* removable" (emphasis added)); *Benson v. SI Handling Sys., Inc.*, 188 F.3d 780, 782 (7th Cir. 1999) (Easterbrook, J.) ("[Section 1446(b)(3)] tells us that even when a case is not removable at the outset, a notice of removal may be filed within 30 days after it becomes removable. This implies that an unsuccessful earlier attempt to remove is not dispositive.").

of the federal case.[27]  Nor does the Defendants' effort to invoke

fraudulent joinder by hindsight comport with the purpose

underlying the fraudulent joinder doctrine, namely, to "prevent

plaintiffs from joining non-diverse parties in an effort to

defeat federal jurisdiction."[28]

Assuming that their collateral estoppel defense is properly

before the Court, the Defendants have failed to establish that

the defense bars the Plaintiffs' claims against CareFirst.

Under Maryland law,[29] four elements must be satisfied:

---

[27] *See, e.g., Insegna-Nieto v. State Farm Mut. Auto. Ins. Co.*,
2013 WL 101400, at *3, *6 (D. Nev. Jan. 7, 2013) ("Plaintiff
knew *at the time of filing her complaint* that she had released
Connolly from all claims and causes of action, and that the
state court had finally decided this issue.  Connolly was
fraudulently joined because plaintiff has obviously failed to
state a cause of action against Connolly." (emphasis added));
*see also Briarpatch Ltd. v. Phoenix Pictures, Inc.*, 373 F.3d
296, 300-02 (2d Cir. 2004); *Green v. Amerada Hess Corp.*, 707
F.2d 201, 205-06 (5th Cir. 1983); *Marshall v. Kan. City S. Ry.
Co.*, 372 F. Supp. 2d 916, 918-19, 921 (S.D. Miss. 2005).

[28] *Briarpatch*, 373 F.3d at 302; *see also Linnin v. Michielsens*,
372 F. Supp. 2d 811, 817 (E.D. Va. 2005) ("Whe[n] a non-diverse
defendant is named *in the initial state court complaint as part
of a tactical effort to defeat diversity jurisdiction*, the
fraudulent joinder doctrine permits district courts to assume
jurisdiction over a case even if there are named defendants who
lack diversity at the time the case is removed." (emphasis
added)).

[29] Generally, "the question of the recognition to be given by one
federal court to proceedings in another federal court should be
resolved as a matter of federal law." *Atkins v. Schmutz Mfg.
Co.*, 435 F.2d 527, 535 (4th Cir. 1970) (en banc).  But, "that is
not true where, as here, the court is evaluating the merits of a
fraudulent joinder claim," *Green v. Amerada Hess Corp.*, 707 F.2d
201, 206 (5th Cir. 1983): instead, the issue is whether the

> 1. Was the issue decided in the prior adjudication
> identical with the one presented in the action in
> question?
> 2. Was there a final judgment on the merits?
> 3. Was the party against whom the plea is asserted a
> party or in privity with a party to the prior
> adjudication?
> 4. Was the party against whom the plea is asserted
> given a fair opportunity to be heard on the issue?

*Wash. Suburban Sanitary Comm'n v. TKU Assocs.*, 376 A.2d 505, 514

(Md. 1977). To establish the second element, the estoppel

proponent must show that the relevant issue was "actually

litigated and determined by a valid and final judgment," *and*

that the determination was "*essential to the judgment*."

*Colandrea v. Wilde Lake Community Ass'n, Inc.*, 761 A.2d 899, 907

(Md. 2000) (emphasis added) (internal quotation marks omitted).[30]

Essentiality or necessity "must be present for collateral

estoppel to apply." *Brown & Sturm v. Frederick Road Ltd.*

*P'ship*, 768 A.2d 62, 85 (Md. Ct. Spec. App. 2001).

Assuming that CareFirst's bad faith and culpability in

*Feldman's I* is identical to the issues presented in this case,

Judge Gauvey's determination that CareFirst was not culpable was

not essential to her decision to deny Feldman's attorneys' fees.

---

plaintiff would be able to establish a cause of action against
the in-state defendant *in state court*, *Hartley v. CSX Transp.,
Inc.*, 187 F.3d 422, 424 (4th Cir. 1999).

[30] *See also Gibson v. State*, 616 A.2d 877, 880 (Md. 1992) ("The
collateral estoppel doctrine operates to a preclusive end, so
that when an issue of *ultimate fact has been determined* once by
a valid and final judgment, the issue cannot be litigated again
between the same parties in a future." (emphasis added)).

Rather, the decision was guided by her examination of four additional factors, including, *inter alia*, that the case did not resolve any significant legal question, but rather was brought by Feldman's for its own benefit. 898 F. Supp. 2d at 910. She concluded, "*[f]or all the reasons stated*," that the case was not so "unusual" as to "compel[] an award under the governing law." *Id.* at 911 (emphasis added).[31] Because the determination as to bad faith was not essential to the denial of attorneys' fees--i.e., Judge Gauvey "could have reached the same disposition by resting [the] judgment on grounds for which that finding of fact was not required"--collateral estoppel does not apply. *Brown & Sturm*, 768 A.2d at 85-86.

Finally, even if the collateral estoppel doctrine were properly before the Court--which it is not--and applied to the Plaintiffs' claims against CareFirst--which it does not--the Defendants' argument would fail for the additional reason that it is--according to the Defendants--equally applicable to

---

[31] The Defendants argue, without elaboration, that the "finding" as to bad faith was "necessary" because Judge Gauvey "explicitly found no evidence of *either* 'bad faith' or 'culpability' on CareFirst's part." ECF No. 45 at 13 (emphasis added). This argument misses the point. As explained above, Judge Gauvey denied Feldman's request for attorneys' fees under ERISA after considering *Quesinberry's* five factors--*one* of which was the "degree of [CareFirst's] culpability or bad faith." *Quesinberry*, 987 F.2d at 1029. None of the five factors was dispositive. *Id.* ("This five factor approach is not a rigid test, but rather provides general guidelines for the district court in determining whether to grant a request for attorneys' fees.").

Independence, QCC, and the Association, under the theory of non-mutual defensive collateral estoppel. ECF No. 12 at 12; ECF No. 13-1 at 7.

Under the "common defenses" rule, which was established by the Fifth Circuit[32] and has since been adopted by courts in at least two other circuits,[33] "[w]hen a nonresident defendant's showing that there is no reasonable basis for predicting that state law would allow recovery against an in-state defendant equally disposes of all defendants, there is no improper joinder of the in-state defendant. In such a situation, the entire suit must be remanded to state court." *Smallwood*, 385 F.3d at 571. The court explained:

> when, on a motion to remand, a showing that compels a holding that there is no reasonable basis for predicting that state law would allow the plaintiff to recover against the in-state defendant necessarily compels the same result for the nonresident defendant, there is no improper joinder; there is only a lawsuit lacking in merit. In such cases, it makes little sense to single out the in-state defendants as "sham" defendants and call their joinder improper.

---

[32] *Smallwood v. Ill. Cent. R.R.*, 385 F.3d 568 (5th Cir. 2004) (en banc).

[33] *See Boyer v. Snap-On Tools Corp.*, 913 F.2d 108, 113 (3d Cir. 1990) ("[W]here there are colorable claims or defenses asserted against or by diverse and non-diverse defendants alike, the court may not find that the non-diverse parties were fraudulently joined based on its view of the merits of those claims or defenses."); *In re New Eng. Mut. Life Ins. Co. Sales Practices Litig.*, 324 F. Supp. 2d 288, 298-304 (D. Mass. 2004).

*Id.* at 574.[34]

As explained above, a decision is preclusive if: (1) the issue decided is identical to the one presented in the action in question; (2) the prior adjudication was a final judgment on the merits; (3) the party against whom the plea is asserted is a party or in privity with a party to the prior adjudication; and (4) the party against whom the plea is asserted had a fair opportunity to be heard on the issue. *Wash. Suburban Sanitary Comm'n*, 376 A.2d at 514. Traditionally, collateral estoppel requires mutuality of parties. *Burruss v. Bd. of Cnty. Comm'rs of Frederick Cnty.*, 46 A.3d 1182, 1193 (Md. 2012). "Thus, under the traditional doctrine, only in a second suit *between the same parties* will a determination of fact or law that was actually litigated and was essential to a valid and final judgment be conclusive." *Id.* (emphasis in original). However, the Maryland Court of Appeals has recognized the doctrine of non-mutual defensive collateral estoppel, *id.* at 1194, which bars

---

[34] *See also Sims v. Shell Oil Co.*, 130 F. Supp. 2d 788, 798 (S.D. Miss. 1999) (a defendant cannot "pick and choose" which parties to "keep" and which to "attack" as fraudulently joined; "[t]o do so is an attempt to manipulate the jurisdiction of th[e] court-- the exact conduct that defendant accuses plaintiff of undertaking").

Although the Fourth Circuit has not had occasion to address the common defenses rule, another judge in this District has recognized its sense. *See McGinty v. Player*, 396 F. Supp. 2d 593, 601 (D. Md. 2005); *Riverdale Baptist Church v. Certainteed Corp.*, 349 F. Supp. 2d 943, 951-952 (D. Md. 2004).

plaintiffs from relitigating identical issues by merely switching adversaries, 47 Am. Jur. 2d *Judgments* § 572.

According to the Defendants, Judge Gauvey's September 28 order in *Feldman's I* collaterally estops the Plaintiffs from succeeding on their claims against CareFirst in this case: intentional interference with economic relations; defamation; fraud and fraudulent misrepresentation; unfair competition; conspiracy; and violation of the Maryland Antitrust Act, Md. Code Ann., Com. Law § 11-204(a)(1). Am. Compl. ¶¶ 275-354. With the exception of the claim for fraud and fraudulent misrepresentation, which is asserted against CareFirst alone, each of the claims is asserted against CareFirst and one or more co-defendants. *See generally* Am. Compl. The Association licenses CareFirst and Independence; Independence owns QCC. Am. Compl. ¶¶ 4-6, 76. All the Defendants participated in the alleged pattern of fraud and defamation. *See generally id.* Thus, *assuming* that CareFirst's culpability is the "predicate factual issue underlying CareFirst's alleged liability to [the] Plaintiffs,"[35] and the Association's, Independence's, and QCC's liability is--as the Defendants argue--"entirely secondary to CareFirst's," *e.g.*, ECF No. 12 at 12, "it makes little sense to single out [CareFirst]" as a "'sham'" defendant and call its joinder improper. *Smallwood*, 385 F.3d at 574.

---

[35] ECF No. 45 at 1, 8-14.

In the absence of outright fraud by the Plaintiffs, CareFirst bears the burden of demonstrating that there is *no possibility* of recovery against it. *Hartley*, 187 F.3d at 424 (4th Cir. 1999). For the reasons stated above, the Defendants have failed to carry this burden.

CareFirst--like Feldman's--is a Maryland corporation. Am. Compl. ¶¶ 1, 3. Because there is not complete diversity, this Court lacks diversity jurisdiction. *See Cent. W. Va. Energy Co. v. Mountain State Carbon, LLC*, 636 F.3d 101, 103 (4th Cir. 2011). For the reasons stated in this Court's October 5, 2012 remand opinion, no other basis for federal jurisdiction is present. 902 F. Supp. 2d at 783. Thus, the motion to remand will be granted.

3. Attorneys' Fees and Costs

Under 28 U.S.C. § 1447(c), the Court may require "payment of just costs and any actual expenses, including attorney[s'] fees, incurred as a result of the removal." The Court should award attorneys' fees and costs "only whe[n] the removing party lacked an objectively reasonable basis for seeking removal." *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 141 (2005). 28 U.S.C. § 1927 permits sanctions against attorneys who "multipl[y] the proceedings . . . unreasonably and vexatiously."

The Plaintiffs seek attorneys' fees and costs incurred in opposing removal and the Defendants' motions to dismiss. ECF

No. 38 at 1, 7. The Defendants argue that the complexity of the issues raised by their attempted removal counsel against granting attorneys' fees. ECF No. 45 at 16-17.

"[A] plaintiff has every right to do all that is possible, within the bounds of ethical constraints, to ensure that his case remains in state court; a defendant has an equally defensible privilege to do all it can, under like constraints, to push or pull the action into federal court." *Sledz v. Flintkote Co.*, 209 F. Supp. 2d 559, 564 (D. Md. 2002). Although the Court has concluded that removal was improper, it does not find that the Defendants were objectively unreasonable in seeking removal. Thus, Feldman's request for attorneys' fees and costs under 28 U.S.C. §§ 1447(c) and 1927 will be denied.

B. The Motion for Sanctions

The Plaintiffs seek sanctions against the Defendants on the basis that removal was improper, the Defendants assert "frivolous" arguments in their motions to dismiss,[36] and "[t]he effect of Defendants' actions in serially attempting to remove this case and moving to dismiss has been to delay the prosecution of this action and to increase Plaintiffs' legal expenses, all to Plaintiffs' prejudice." ECF No. 42 ¶¶ 16-22.

---

[36] The Plaintiffs argue that "the First Motions to Dismiss" (in No. WDQ-12-0613) are "still pending and have not been ruled upon," and the Plaintiffs "have not served any new pleadings or modified the [amended complaint] in any respect since it was filed on January 18, 2012." ECF No. 42 ¶ 18.

Under Federal Rule of Civil Procedure 11(b), an attorney certifies to the court that to the best of his "knowledge, information, and belief" formed after a reasonable inquiry: (1) the action is not being presented for an improper purpose, (2) the legal contentions are warranted, (3) the facts alleged have or will have evidentiary support, and (4) denials of facts are based on evidence or lack of knowledge. *See* Fed. R. Civ. P. 11(b). "[I]mproper purpose may be inferred from a claim's lack of factual or legal foundation or other factors such as the timing of filing of the complaint." *Giganti v. Gen-X Strategies, Inc.*, 222 F.R.D. 299, 313 (E.D. Va. 2004) (*citing In re Kunstler*, 914 F.2d 505, 518 (4th Cir. 1990)). Rule 11(c) allows attorneys and parties to be sanctioned for Part (b) violations.

As discussed above, the Defendants' second removal of this action--although ultimately unsuccessful--does not appear to have been frivolous or undertaken in bad faith. *See supra* Part II.A.3. The Plaintiffs' motion for sanctions will be denied.

III. Conclusion

For the reasons stated above, the Plaintiffs' motion to remand will be granted, their motion for sanctions will be denied, and the action--and all other pending motions--will be remanded to the Circuit Court for Baltimore City.

_8/6/13_
Date

William D. Quarles, Jr.
United States District Judge